Our next case is Steines v. Westgate Palace, L.L.C. We're going to wait just a moment until the courtroom settles down, and then we will get started after that. All right, Mr. Pelzer, you may begin when you're ready. Thank you, Your Honor. Good morning. May it please the Court, my name is Jack Pelzer. I'm here today representing the Westgate defendants. The question in this case is whether a delegation clause itself, standing alone, is enforceable regardless of the enforceability of the underlying arbitration clause. This Court answered that question about two years ago in Attucks, and if you'll forgive the quote, this Court said, all questions of arbitrability are delegated to an arbitrator, including questions about whether the party's arbitration agreement is enforceable. But Attucks seems a little bit different to me. I mean, the statute that was involved in Attucks did not have the notwithstanding language in it, did it? It did not. Frankly, Your Honor, the language in the Dodd-Frank Act, if anything, is a bit broader than the arbitration as to anything having to do with the entire transaction, whereas in this case, the MLA only precludes arbitration with respect to consumer credit transactions. But to Judge Rosenbaum's question, I mean, it's right on the nose or in your face, right? I mean, could it possibly be any more in your face than saying notwithstanding anything in Section 2 of the FAA? Frankly, Your Honor, the way we read the notwithstanding sentence, and if you go on and read the entire sentence, it does not preclude delegation at all. It only precludes arbitration. But what about — I'm sorry, go ahead. And even then, only with respect to consumer credit transactions. But what about cases like CompuCredit Corp. versus Greenwood, where the court was talking about language in the Credit Repair Organizations Act and said that that language, which gave a right to sue a credit repair organization that violates the Credit Repair Organization Act and voided any waiver by any consumer of any protection provided by or any right of the consumer under the subchapter, did not create an exception to the FAA or did not preempt the FAA. But in discussing that, it compared the Credit Repair Organizations Act, which doesn't override the FAA, with other statutes that do override the FAA. And it talked about the language from the Motor Vehicle Franchise Contract Arbitration Fairness Act, which provides notwithstanding any other provision of law, et cetera. Why isn't that case from the Supreme Court, which puts the notwithstanding language in a completely different category than the language that appears in the Dodge-Frank Act, why doesn't that control our analysis? Well, the notwithstanding language has to be read in connection with the remainder of the sentence. And what we are saying, notwithstanding, would nevertheless survive the FAA. The Motor Vehicle Act that Your Honor referenced is actually a very interesting example. Because it demonstrates one of the ways that Congress could, if it chose, actually make delegation clauses themselves irrelevant or unenforceable. And that is by simply saying that there shall be no pre-dispute arbitration whatsoever. In other words, you have to wait until you have a dispute and then you can, between yourselves, decide to arbitrate it. And of course, under those circumstances, you eliminate virtually all questions of arbitrability or delegation. And so, you take arbitrability out of the equation. There's another Supreme Court case called Epic Systems Corp. v. Lewis. And in that case, the Supreme Court was considering whether the National Labor Relations Act overrides the FAA. And the Supreme Court said that when Congress wants to mandate particular dispute resolution procedures, it knows exactly how to do so. And then, to illustrate that principle, the Supreme Court listed the MLA, among other statutes, as an example of Congress speaking clearly on that issue. What should we make of that? That was restricted to the question of the arbitrability language. The delegation language. But isn't the delegation language really, that is another arbitration contract, right? So, why wouldn't it also be subject to the exact same thing? Because under the FAA, and we are within the ambit of Section 1 of the FAA, otherwise we wouldn't need the notwithstanding language. In fact, that's a concession, really, by the MLA, is that it's within the Section 1 ambit of the FAA. But has, is there any indication, can you point to any statutory authority where courts are supposed to treat cases differently when they are preempted specifically and expressly in statute, in Section 1, versus when they are preempted specifically and acceptably and expressly in other statutes that say notwithstanding? Again, you have to look at what the notwithstanding relates to. If the notwithstanding went on, as this Court attempted to do in Addicts and may very well have been effective, the Court didn't vouch for the language, but attempted to craft language that would be directly directed to a delegation clause. And if a statute had that kind of language in it... I guess, I'm sorry to interrupt, but I'm not understanding why it has to say specifically a delegation clause if we have agreed that a delegation clause is itself an agreement to arbitrate what is going to be arbitrated. So why wouldn't it be subject to the exact same thing? And this is when we get back to whether you're within the ambit of Section 1 of the FAA, the separability concept that has developed throughout the Supreme Court jurisprudence and this Court's jurisprudence and other courts of appeals, that you have to look at the questions separately. And so the question has to be, first, is the delegation clause... Is there a delegation clause in the contract? And is this dispute within the scope of the delegation clause? If that's the case, then you send the case to the arbitration... I'm sorry, but does the MLA carve out an exception for delegation clauses? Because if it doesn't, and it applies to all arbitration, and we've agreed that a delegation clause is an agreement to arbitrate what we're going to arbitrate, I'm still... And I'm sorry, I just... It seems like we're still stuck in the same problem. This is the chicken and egg conundrum that my colleagues propose about how do you arbitrate arbitrability. And all I can say about that is this is the rubric that was laid out by the Supreme Court, I think starting in Buckeye, but it may have even come before then, that when you have an arbitration clause or a delegation clause, you first have to determine whether or not that is enforceable before you can go on to adjudge the merits. And the Court said in Buckeye, this Court said the same thing in Addicts, that you can very well have an issue sent to the arbitrator and send it to the arbitrator, an unenforceable agreement, and then it's up to the arbitrator to send it back. But the problem is in those cases that you've cited, they don't have... They're either not exempted in Section 1, or they don't have statutes that appear to expressly otherwise exempt them from the MLA. Or whatever the statute might be. I don't think that's really the case, Your Honor. Okay. The Dodd-Frank Act that this Court considered in Addicts clearly prohibited arbitration. But again, then we get back to the absence of the notwithstanding language. The notwithstanding is just another way of expressing the prohibition of arbitration. It only prohibits arbitration. It does not prohibit delegation. And this Court was very clear in Addicts that in order to reach the delegation argument, there has to be language that prohibits the delegation of threshold arbitrability issues itself. And so the language has to be directed to the delegation. And so that's what this Court attempted to draft in Addicts, was statutory language that would in fact go directly to the delegation clause. Or the Court could, or Congress could, say for example, make it only post-dispute arbitration. Or Congress could, in the same bill or act, amend Section 1 of the FAA. I think that runs into the new prime, though. I mean... Well, new prime, actually Your Honor supports our position here because in new prime, we had an exception that was within Section 1 of the FAA. Because at the time the FAA was adopted, there was already congressionally created dispute settlement mechanisms for this type of interstate commerce. And so they accepted that from the ambit of the FAA and said, we're not going to do arbitration there. And that's what came up in the new prime case. So the Court said, we don't even need to discuss the FAA here because the FAA itself says that it's inapplicable. Compare that to the MLA situation where we need to have the notwithstanding language. Because... But here's the problem with that, right? There are two steps you're taking. There's sort of, maybe you're conflating two things. One is new prime stands for the proposition that a delegation clause is itself its own agreement to arbitrate, right? Would you agree with me on that? Yes. Okay. And so if it is in and of itself its own agreement to arbitrate, then we don't get to the next issue unless it is not otherwise preempted from being arbitrated. Frankly, Your Honor, I think the conflation comes in saying when you go through the delegation clause to look at the subject matter of the arbitration clause and further into the merits to determine whether this is a consumer credit transaction and thereby essentially commit a fundamental logical fallacy. That just seems to me to be sort of the order of battle that the MLA prescribes. Notwithstanding Section 2 of Title IX or any other federal or state law, rule or regulation, no agreement to arbitrate, which you've agreed, includes a delegation clause, you know, should be enforceable in, as you say, a consumer credit transaction. But that's just sort of what the MLA prescribes. Jay, I think you've misconstrued my concession. My concession is that delegation is a form of arbitration. But a delegation clause is a separate agreement from the arbitration agreement, and it must be considered separately. And there must be, in order to prevent the enforcement of a delegation clause, there must be directions directly to the delegation concept in the statute. It's not sufficient merely to preclude arbitration. The statute must also preclude delegation. And that's what this Court said in Addicts and actually, as they say, took a stab at drafting language to do that. Can I ask you to help me with the second question here, the application of the MLA? The parties agree that the loan relating to the timeshare agreement falls under consumer credit generally, but disagree over whether the timeshare agreement itself here falls within an exception for a residential mortgage. Tell me why you think a timeshare interest, as it was evidenced in this case, is a residential mortgage. Principally, Your Honor, because under Florida law, which is what governs here, the timeshare interest that was sold is an interest in real estate. It's defined as such in the statute. And not just a condominium, but a timeshare condominium is an interest in real estate. It's conveyed by a deed recorded in the public records. It is encumbered by a mortgage recorded in the public records, and it carries with it an obligation to pay property taxes to the local tax collector. And so this was a real estate transaction. My colleague attempts to disparage this and say it's really just a vacation loan kind of plan, but that is not the structure of this transaction at all. This was a real estate transaction. What exactly were they buying? They were buying, if I have it right and correct me if I've misunderstood it, a one-week interest. Over a period of two years in a building, in one of 207 apartments in the building. That's correct, Your Honor. They were a tenant in common, and that is the definition of their interest as tenant in common. Usually when we speak of a residence and what it means, we look at the common understanding as it's a dwelling where somebody lives for some time or where they actually live as opposed to a place of a more temporary character. Isn't this more like a hotel than it is like a residence? No, Your Honor, it is not. In Schwarz 4, as we termed it in the briefs, this Court talked about two different factors, one of which was the timing. The Third Circuit pointed out that the average length of a hotel stay is about two days. The one-week term in this condominium unit is three and a half times that. Of course, this Court did not set a floor in Schwarz 4, but did say that I believe it was two weeks in that instance was enough to qualify as a residence. And really what we're talking about here is nothing more than a vacation home, as though a group of family members or friends got together and bought a beach house or a ski lodge or a hunting cabin, and they split up the use of it and said you get it this time, I get it that time. What we wrote in Schwarz 4 is the following, and I quote it for you. We think the difference between a home and a hotel suggests at least two relevant principles. First, the more occupants treat a building like their home, for example, they cook their meals, clean their rooms, maintain the premises, do their own laundry, spend their free time together in common areas, the more likely it is a dwelling. And two, the longer the typical occupant lives in a building, the more likely it is that the building is a dwelling. Are those considerations relevant? That's binding case law on us. Yes, absolutely relevant. And if you look at what the physical structure of these condominium units are, we're talking two-bedroom units, two baths, full-size living room for the family to congregate. But what I want to really focus you on was the second clause, which was the temporal one. The longer the occupant lives in a building, the more likely it is that we'll call the building a dwelling. This is one week over 104 weeks over two years. And Schwarz, we were talking about a rehab house. Right. Context was very different. And there are two weeks was found to be sufficient. Here I would say one week ought to be sufficient, and certainly it's dramatically more, a factor of 3.5 times what a hotel stay, the average hotel stay is. So, again, I'm well over my time. I apologize. That's okay. We took you there, and we appreciate your answers. And you have saved four minutes for rebuttal. We'll hear from Ms. Bennett. May it please the Court, Jennifer Bennett on behalf of the Steins. I'll just start right in on the questions about addicts that we were discussing in the first part of Westgate's argument. There are two key differences here in the Military Lending Act that were not at issue in addicts and that are different from the provision of the Dodd-Frank Act that addicts was talking about. The first is, as we discussed earlier, that the Military Lending Act explicitly says Section 2 of the Federal Arbitration Act does not apply. That's where the severability principle comes from. That's what the Supreme Court said in Renta Center. Without Section 2, you don't have severability. And I think Westgate has conceded that their argument depends on the severability principle. So that's one big difference from addicts. We're just not in FAA land at all. But the second difference from addicts is that in addicts, what the Court held is even if the Dodd-Frank Act applies, it doesn't bar the enforcement of this particular delegation clause based on the specific language of the Dodd-Frank Act. So you could delegate the dispute that the parties had, and even if it turns out the Dodd-Frank Act applies later, you haven't violated the law. The Military Lending Act is different. Under the Military Lending Act, enforcing the delegation clause in this case, if the Military Lending Act applies, would violate the Military Lending Act, and it would do so in two ways. The first is that the Military Lending Act, and this is E3, says it's unlawful for a lender to, in the course of extending consumer credit, require them to submit to arbitration. It doesn't make any distinction between arbitration on the merits, delegation clauses, anything. Any requirement that a borrower submit to arbitration in connection with consumer credit is not just unlawful, there are criminal penalties associated in the Military Lending Act. And what the Supreme Court said in Kaiser is courts are not permitted to enforce illegal contracts. So it's just quite different from what was going on in the Dodd-Frank Act. And second, you have F4, which similarly says, notwithstanding Section 2, notwithstanding the severability provision, any agreement to arbitrate any dispute involving the extension of consumer credit can't be enforced. And what Westgate itself says, and this is on page 15 of its opening brief, what Westgate itself says is that the Military Lending Act prohibits the arbitration of disputes about the concept of consumer credit. And the dispute that Westgate wants to send to arbitration is, is its loan consumer credit, because that's what the enforceability of its arbitration clause, the merits arbitration clause, depends on. So there, too, you know, even under, if you take Dodd-Frank's analysis under the Federal Arbitration Act, here, the Military Lending Act specifically renders the delegation clause itself unenforceable. So if there aren't any questions on that, I'll turn to the question of the residential exemption. Great. So I want to just take a step back for a second when talking about this residential mortgage exemption, because I think it's useful to talk about the context that we're in. So all of the cases that are discussed in the briefs, or at least most of them, are under the Fair Housing Act. And there, you have a statute that's meant to prohibit discrimination in lending, rather not in lending, in renting and selling dwellings. And what we have is a statute that the Supreme Court has told us to interpret broadly to protect people from discrimination. Here, what we have is a statute that Congress passed at the behest of the Department of Defense to protect service members from low-value loans because they were getting into debt and losing their security clearances, and it was hurting the war effort. And we're talking about an exemption from this statute that is meant to protect people from low-value loans for residential mortgages. And the question is, does a loan that allows a service member to potentially take a vacation once every other year, is that a residential mortgage? I don't think any of us would think of the term residential mortgage to cover that kind of a loan. And Congress could have, the Department of Defense could have defined the word residential mortgage in a unique way that maybe we could have some argument about, but it didn't. The Department of Defense gave it its very natural definition, and I'll just read it to you. What the regulations say is, it's any credit transaction secured by an interest in a dwelling. And then it says what a dwelling is, is a residential structure that contains one to four units. And Westgate's own documents demonstrate that it doesn't satisfy this definition. So we can start with the requirement of one to four units, and I think that's the most straightforward path here. The definition, again, is it has to contain one to four units, and if you look at the timeshare plan, it's at appendix 153, it tells you what the timeshare interest that Westgate has given the service member was, what the timeshare interest Westgate gave the Steins. It is approximately, I did the math, approximately 121,000th of a, quote, undivided interest only in the building in which the unit listed on their paper was located. So the interest, according to the timeshare plan, according to Westgate's own documents, and I think I heard Westgate say this also in its argument, but they can correct me if I'm wrong. The interest is an interest in a building with hundreds of units. It's not an interest in a particular unit, and so it doesn't satisfy this one to four unit requirement. The second requirement that it doesn't satisfy is that it's not residential. And again, Westgate's own documents demonstrate that for us. So if you look at dictionaries, if you look at case law, even under the Fair Housing Act, if you look at Schwartz, what you get is something that's residential is something that's used as a home. It's not something that's used for transient occupancy. That's what all the cases say under the Fair Housing Act, what the dictionaries say. And what Westgate's own timesharing plan says, and this is at 354 of the appendix, it says its suites are for, quote, transient resort occupancy only. And so Westgate's own documents say this is a transient occupancy kind of a thing. It's a hotel. And even beyond that, if you look at Schwartz, what Schwartz says is you've got a home. Well, it's different from a hotel in some regards. There's a deed. There's an interest. He's paying off a mortgage over an extended period. It's not quite the same thing. I check into a hotel. I'm there for a night. I'm there for a week. It's a little bit different, don't you think? Well, so I do think that's what Westgate's argument is that because under state it's done all of these things, right? It's giving you something it's calling a deed. Florida law says you have to pay taxes on it. I'll note I pay taxes on the hotel I stayed in last night also. Florida law calls it real estate. Well, I'm not paying it off over an extended period of time because I basically I have it for an extended period of time. I have access for one week every other year for an extended period of time. One is I don't think the details of the transaction either under state law or as Westgate has arranged them determine what constitutes a residential structure. None of those factors are in what the Department of Defense has said what this means. But the second is it doesn't even give you. So it may be a harder case if what you had is you have a unit. It's yours. You own it. You can keep people out even if it's just one particular week every other year. I still think that we are very much particularly since we're talking about an exception from a statute meant to protect service members. I still think we would very much say that that's not a residential mortgage. But here we don't have anything like that. What we have what they bought is a right to make a reservation if one is available. And if you look at page 335 of the appendix, it makes it really clear if the hotel is booked at the time, the signs are out of luck. They don't get to stay there. They still have to pay off the loan. But if they don't reserve in time, if the hotel is booked, they can't get any unit there at all. No suite there at all. We have the testimony from Westgate's representative, which is the hearing transcript is document 85. And what she says is only 30% of these suites are timeshares. This is just a hotel. And the rest are just hotel suites. They're the same as the ones the signs can book. There's an exchange program. This is also in the representative's testimony. So it's not even that they're necessarily booking a suite at the same hotel. They're essentially getting a loan to book a suite at any of Westgate's resorts anywhere in the country. And so it just doesn't look anything like what you might think of as even, you know, the vacation home that we were talking about where you own a particular home and you get to go there. And just one more point on that. You know, I think that Westgate talks a lot about the listing of a particular unit number on the deed. And that unit number, again, Westgate's timesharing plan makes really clear that that unit number doesn't actually mean anything. And this is at page 156 of the appendix. What the timesharing plan says is the signs, quote, shall not be entitled to possession and use of the specific unit or the unit week listed on their deed. So it's essentially just a serial number that they're giving people who take out these loans. It doesn't entitle them to a right to do anything. So it is, I think, very much like a hotel, which is the only thing that they get is the right to say, you know, I want to make a reservation if you're not full, except that they've prepaid in advance and they've taken out a $20,000 loan to get this right to try to make a reservation at this hotel. And I think, especially considering the purpose of the Military Lending Act and the fact that we're trying to talk about what a residential mortgage is, I just don't think there's any way of reading those words to encompass this kind of loan. Unless there are further questions. Thank you, counsel. And Mr. Posser, you've reserved four minutes. Thank you. There are two points my colleague made with respect to the first, what I consider the primary issue. First, she says that Section 2, or excuse me, that the MLA makes Section 2 of the FAA completely inapplicable to the MLA. I would please the text of the MLA does not say that. It says that Section 2 of the FAA is not applicable to consumer credit transactions, and that is the issue that we need to have determined by the arbitrator in order to determine arbitrability. The other point that she makes is to attempt to distinguish the Dodd-Frank Act from the MLA by pointing out that the MLA has these two sections. The Dodd-Frank Act has the exact same structure. There is a thou shalt not section that says thou shalt not have arbitration. Then there's a consequences section. What happens if you do have an arbitration clause in your agreement? And so that's the exact same structure in both Acts. What's the clearest, and I might just not have found it, but what's the clearest language in the Dodd-Frank? What's the thou shalt not provision? And what does it say? I couldn't quote it to you from memory from the Dodd-Frank, but it basically says that arbitration is prohibited. And that's what this Court concluded in Attics by reading those two clauses together. It just said, you know, this is a prohibition, and that's exactly what we have in the MLA, a prohibition of arbitration. That is not the same thing as saying there's a prohibition of delegation. Is the structure in Dodd-Frank, though, the same in the sense that it says, essentially, as the MLA does, we see this thing over there, the FAA? We are accepting ourselves from that. The Dodd-Frank Act does not specifically cross-reference the FAA, but that's a distinction without a difference in this context. Because by saying that you cannot have arbitration, you have essentially, by that language itself, precluded the application of Section 2 of the FAA. Yeah, I guess this was sort of the source of the question that I asked you at the outset, though. The on-the-noseness of the MLA is relevant to me because all of this severability and delegation clause precedent arises out of the FAA, right? And so if the MLA basically turns to the FAA and just punches it in the face and says, we're not doing that, then it seems much clearer there than in Dodd-Frank and Attucks that they are walking away from all this precedent that has grown up under the FAA. Respectfully, Your Honor, your paraphrase of that section, that notwithstanding language, is far stronger than the actual language. Because it is limited arbitration, not delegation, and it is limited to the consumer credit concept. So that leaves open the possibility of the delegation. I'd like to move on to the second point. My colleague made a number of points that I'd like to address. First and foremost, we have not found, and my colleague has not cited, a single case that has determined that a property is not residential when it has been conveyed by a deed, encumbered by a mortgage, and incurs property taxes. That case does not exist. It certainly hasn't been cited in this case. So I would suggest to you that that should be a critical test. The one-to-four units argument, I'd point out that the very next sentence of that CFR section says it can be a condominium unit. The one-to-four units is how many units the service member can own, not how many can be in the building. That is a completely red herring. And as Judge Marcus pointed out, the interest that the Steins acquired was a perpetual interest. They chose to limit their use in this one particular unit, which is named in their deed, by agreeing to go into a flex plan so that they could choose different weeks, different units within the building, et cetera. That was the choice they made. That does not undermine the fact that they own an undivided interest in that one real estate unit. Thank you, Counsel. All right. Thank you both, and we will be in recess until tomorrow. All rise.